[Cite as *Ozvath v. Buckeye Union Ins. Co.*, 196 Ohio App.3d 658, 2011-Ohio-5814.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

OZVATH, :

    Appellee and : C.A. CASE NO. 24364
    Cross-Appellant,

v. : T.C. NO. 06CV6132

BUCKEYE UNION INSURANCE : (Civil appeal from
COMPANY, Common Pleas Court)

    Appellant and :
    Cross-Appellee.

. . . . . . . . . .

# **O P I N I O N**

Rendered on the   10th   day of   November  , 2011.

. . . . . . . . . .

Dianne F. Marx, Toby K. Henderson, and Scott S. Davies, for appellee and cross-appellant.

Martin T. Galvin and Marianne Barsoum Stockett, for appellant and cross-appellee.

. . . . . . . . . .

FROELICH, Judge.

**{¶ 1}** This appeal arises out of a dispute between Charles Ozvath and Buckeye Union Insurance Company over whether Buckeye (now Continental Insurance Company) was required to defend Ozvath in a collection action filed by Robert Harbin and the extent to which Buckeye was required to reimburse Ozvath for his attorney fees and settlement costs. By way of summary judgment, the trial court found that

Continental (the successor by merger with Buckeye) had a duty to defend Ozvath in the collection action, but did not have to indemnify Ozvath for the amount he paid in a settlement with Harbin. After a hearing, the court ordered Continental to pay some, but not all, of the attorney fees and prejudgment interest that Ozvath sought from Continental.

{¶ 2} Continental appeals, claiming that the trial court erred in determining that the insurance company had a duty to defend Ozvath and in granting attorney fees to Ozvath. Ozvath cross-appeals, claiming that the trial court should have ordered Continental to indemnify Ozvath for the amount of the collection-action settlement and that it erred in reducing the amount of claimed attorney fees and prejudgment interest.

{¶ 3} For the following reasons, the trial court's judgment in favor of Ozvath is reversed, and the case is remanded for the trial court to enter judgment in favor of Continental.

I

{¶ 4} In 1994, Robert Harbin, an employee of Ohi-Tec Manufacturing, Inc., was injured at work by a 150-ton mechanical press, resulting in the amputation of two fingers and the loss of use of another finger. Harbin sued Ohi-Tec in the Clark County Common Pleas Court for his personal injuries, and he alleged intentional tort, negligence, and punitive damages; he also claimed that the employment-intentional-tort statute (R.C. 2745.01) was unconstitutional. Buckeye defended Ohi-Tec under a reservation of rights pursuant to an insurance policy issued to Ohi-Tec (and of which Charles Ozvath was a named insured). Buckeye informed Ohi-Tec that while the policy excluded claims based on intentional acts, the policy would "provide indemnity for

any damages which would be awarded as a result of the negligence claims made in Count 2." Ozvath was not named as a defendant in the personal-injury action.

{¶ 5} After a jury trial, a jury awarded Harbin $750,000 in compensatory damages on his employer-intentional-tort claim and $300,000 in punitive damages. Ohi-Tec moved for judgment notwithstanding the verdict ("JNOV"), which the trial court granted; the trial court also stated in its decision that if the appellate court reversed the judgment of the trial court on the JNOV, the trial court provisionally granted Ohi-Tec's motion for a new trial. On June 14, 2002, we reversed the trial court and ordered it to enter judgment in favor of Harbin, as found by the jury. *Harbin v. Ohi-Tec Mfg., Inc.*, Clark App. No. 2001 CA 70, 2002-Ohio-2923. The parties represent that Harbin sought to collect the judgment from Buckeye, but he was unsuccessful.

{¶ 6} In August 2002, Harbin brought suit ("the collection action") in the Montgomery County Common Pleas Court against Charles Ozvath, his wife, and his three sons (all of whom were allegedly owners of Ohi-Tec) and Ohi-Tec. Harbin stated in his complaint that Ohi-Tec had failed to satisfy the employer-intentional-tort judgment, and through various claims of fraud, Harbin sought to pierce Ohi-Tec's corporate veil. Stated generally, Harbin alleged that Ozvath had fraudulently transferred the assets of Ohio Pressed Steel (an alleged predecessor company of Ohi-Tec) to himself (Ozvath), created Ohi-Tec, and then fraudulently transferred shares of Ohi-Tec to his sons.[1]

{¶ 7} In early 2003, Ohi-Tec filed for protection under Chapter 11 of the United

---

[1]Specifically, Harbin's complaint brought claims of piercing the corporate veil (Counts 1 and 2), successor liability/constructive trust (Count 3), violation of the Ohio Fraudulent Transfer Act (Count 4), receivership (Count 5), and punitive damages (Count 6).

States Bankruptcy Code, and the collection action was stayed. Ohi-Tec also removed the collection action to federal district court. In March 2005, the federal district court remanded the collection action to the Montgomery County Common Pleas Court, and the bankruptcy court granted Harbin derivative standing to pursue the collection action against the Ozvaths in the common pleas court. The bankruptcy stay was lifted in April 2005.

{¶ 8} In January 2006, Harbin filed a second amended complaint in the collection action, which indicated that he was pursuing the case against the Ozvaths with derivative standing for the bankruptcy estate of Ohi-Tec. In March 2006, Ozvath filed a notice of claim with Buckeye seeking to have Buckeye defend him against Harbin's collection action and to indemnify him against any damages. On May 23, 2006, Buckeye notified Ozvath that it was denying coverage because the complaint alleged intentional acts, it did not allege an "occurrence" as defined by the policy, and punitive damages are not covered as a matter of public policy. Harbin filed a third amended complaint in the collection action in June 2006.

{¶ 9} In August 2006, Ozvath initiated this action against Buckeye, seeking a declaratory judgment and damages for breach of contract. Ozvath requested that the trial court "declare that Buckeye is obligated to provide coverage under the Policy to Mr. Ozvath for the Montgomery County Collection Case, including reimbursement of defense fees and costs, payment of future defense fees and costs and indemnification for any judgment (however unlikely) against Mr. Ozvath." Ozvath also sought damages for the attorney fees and costs that he had expended in defending himself in the collection action.

{¶ 10} The parties filed cross-motions for summary judgment on Buckeye's (now Continental's) alleged duty to defend and to indemnify Ozvath in the collection action. The trial court concluded that Continental had a duty to defend Ozvath in the collection action, but did not have a duty to indemnify Ozvath. (While motions in the declaratory-judgment/breach-of-contract case were pending in the trial court, the collection action settled for $315,000.) The court subsequently held hearings on the amount of attorney fees and prejudgment interest that Continental owed to Ozvath. After a hearing, the court awarded attorney fees and prejudgment interest to Ozvath, although in an amount less than what Ozvath had requested.

{¶ 11} Continental appeals from the trial court's rulings. Ozvath has cross-appealed. We find Continental's first assignment of error to be dispositive.

II

{¶ 12} Continental's first assignment of error states:

{¶ 13} "The trial court erred when it determined that appellant [Continental] had a duty to provide a defense to Charles Ozvath in certain underlying litigation under the terms of the subject insurance policy."

{¶ 14} In its first assignment of error, Continental claims that the trial court erred in granting summary judgment to Ozvath on his claim that Continental had a duty to defend him in the collection action.

{¶ 15} "The purpose of a motion for summary judgment is to test whether genuine issues of material fact exist such that a trial is necessary to resolve those issues." *Abroms v. Synergy Bldg. Sys.*, Montgomery App. No. 23944, 2011-Ohio-2180, ¶ 34. Summary judgment should be granted only if no genuine issue

of material fact exists, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to but one conclusion, which is adverse to the nonmoving party. Civ.R. 56; *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66.

{¶ 16} Upon a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue of material fact exists for trial. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292-293. Once the moving party satisfies its burden, the nonmoving party may not rest upon the mere allegations or denials of the party's pleadings. Id.; Civ.R. 56(E). Rather, the burden then shifts to the nonmoving party to respond, with affidavits or as otherwise permitted by Civ.R. 56, setting forth specific facts that show that there is a genuine issue of material fact for trial. Id. Throughout, the evidence must be construed in favor of the nonmoving party. Id.

{¶ 17} An appellate court reviews summary judgments de novo, meaning that we review such judgments independently and without deference to the trial court's determinations. *Koos v. Cent. Ohio Cellular, Inc.* (1994), 94 Ohio App.3d 579, 588.

{¶ 18} "An insurance policy is a contract between the insurer and the insured. If we must interpret a provision in the policy, we look to the policy language and rely on the plain and ordinary meaning of the words used to ascertain the intent of the parties to the contract. We examine the contract as a whole, which means that an endorsement is read as though it is within the policy.

{¶ 19} "* * * [T]he duty to defend is broader than and distinct from the duty to indemnify. The duty to defend is determined by the scope of the allegations in the complaint. If the allegations state a claim that potentially or arguably falls within the liability insurance coverage, then the insurer must defend the insured in the action. But

if all the claims are clearly and indisputably outside the contracted coverage, the insurer need not defend the insured." (Citations omitted.) *Ward v. United Foundries, Inc.*, 129 Ohio St.3d 292, 2011-Ohio-3176, ¶18-19.

{¶ 20} It is undisputed that Ozvath is a named insured on the Comprehensive Business Policy issued by Buckeye to Ohi-Tec for the period of June 14, 1994, to July 14, 1995. That policy included a Commercial General Liability Coverage Part and a Special Employers Liability Coverage Form (Stop-Gap Endorsement). The Commercial General Liability Coverage Part provided:

{¶ 21} "SECTION I - COVERAGES

{¶ 22} "COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

{¶ 23} "1. Insuring Agreement

{¶ 24} "a. We [Buckeye] will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend any 'suit' seeking those damages. We may at our discretion investigate any 'occurrence' and settle any claim or 'suit' that may result. * * *

{¶ 25} "b. This insurance applies to 'bodily injury' and 'property damage' only if:

{¶ 26} "(1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory;' and

{¶ 27} "(2) The 'bodily injury' or 'property damage' occurs during the policy period.

{¶ 28} "* * *

{¶ 29} "2. Exclusions.

{¶ 30} "This insurance does not apply to:

{¶ 31} "a.  'Bodily injury' or 'property damage' expected or intended from the standpoint of the insured. * * *

{¶ 32} "e.  'Bodily injury' to:

{¶ 33} "(1) An employee of the insured arising out of and in the course of the employment   by the insured * * *

{¶ 34} "This exclusion applies:

{¶ 35} "(1) Whether the insured may be liable as an employer or in any other capacity; and

{¶ 36} "(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury."

{¶ 37} "Bodily injury" is defined as "bodily injury, sickness, or disease sustained by a person, including death resulting from any of these at any time."  "Occurrence" means "an accident, including continuous or repeated exposure to substantially the same harmful conditions."

{¶ 38} The Special Employers Liability Coverage Form (Stop-Gap Endorsement) further provides:

{¶ 39} "SECTION I - COVERAGE

{¶ 40} "SPECIAL EMPLOYERS LIABILITY

{¶ 41} "1.  Insuring Agreement

{¶ 42} "a.  We will pay those sums that the insured becomes legally obligated to pay as 'damages' because of a 'coverage incident' to which this insurance applies.

We will have the right and duty to defend any 'suit' seeking those damages. * * *

{¶ 43} "b.   'Damages' because of a 'coverage incident' include damages claimed by any person or organization for care, loss of services, or death resulting at any time from the 'coverage incident.'

{¶ 44} "2.   Exclusions.

{¶ 45} "This insurance does not apply to:

{¶ 46} "a.   A 'coverage incident' involving an employee employed in violation of law:

{¶ 47} "(1) With your actual knowledge or that of any of your partners or executive officers; or

{¶ 48} "(2) With respect to the payment of any punitive or exemplary 'damages.'

{¶ 49} "* * *

{¶ 50} "f.   'Bodily injury' intentionally caused or aggravated by you, or 'bodily injury' resulting from an act which is determined to have been committed by you with the belief that an injury is substantially certain to occur."

{¶ 51} " 'Coverage incident' is defined as 'bodily injury,' by accident or by disease, to any of your employees which:

{¶ 52} "a.   Arises out of and in the course of the injured employee's employment by you; and

{¶ 53} "b. Occurs in the 'coverage territory.' "

{¶ 54} In          seeking          summary          judgment          in          the declaratory-judgment/breach-of-contract case on its duty to defend Ozvath in Harbin's collection action, Continental focused on the allegations in Harbin's complaint against

Ozvath in the collection action. Continental argued that "all such allegations contained in the Complaint are based on intentional acts committed by Mr. Ozvath, which would serve to pierce the corporate veil and hold him personally liable for any judgments rendered against Ohi-Tec. Consequently, as this Complaint is not alleging an occurrence that is covered under the Buckeye Union policy, a duty to defend or indemnify would not arise." Continental further argued:

{¶ 55} "Indeed, even if that coverage should be provided to Mr. Ozvath as the Montgomery County Collections Case stems from the Clark County Personal Injury Lawsuit, Buckeye still does not have a duty to defend or indemnify as a jury has already adjudicated that the injury sustained by Mr. Harbin was an intentional tort substantially certain to occur from the standpoint of the insured, Ohi-Tec. Consequently, the allegations contained in the Montgomery County Collections Complaint allege that Mr. Ozvath should stand in the shoes of Ohi-Tec as he served as the 'alter-ego' of the corporation."

{¶ 56} In response, Ozvath argued that there was "a substantial and direct connection between the Personal Injury Litigation and the Collection Litigation. * * * [O]nly one loss occurred with respect to Mr. Harbin – the damages caused by his bodily injury. The alleged wrongful acts of Chuck Ozvath * * * did not cause a separate injury or loss. Instead, in the Collection Litigation, Mr. Harbin alleges that Chuck Ozvath committed wrongful acts in an attempt to avoid paying for the loss – the judgment in the Personal Injury Litigation. Thus, * * * the Personal Injury Litigation judgment and the fraudulent transfers alleged in the Collection Litigation are intertwined, directly connected and not remote from each other."

{¶ 57} Focusing on the personal-injury action, Ozvath further argued that the injury to Harbin constituted an "occurrence" within the meaning of the insurance policy and that "there is nothing in the Personal Injury Litigation that suggests that Mr. Harbin's injuries were anything but an accident from Chuck Ozvath's perspective." Ozvath asserted that because he was not a party to the personal-injury action, imputing the jury's determination that Ohi-Tec had committed an intentional tort to him would violate due process. In short, Ozvath argued that there was "no break in causation and there [was] no intervening cause relieving [Continental] of its obligation to defend Chuck Ozvath."

{¶ 58} In concluding that Continental had a duty to defend Ozvath in the action, the trial court adopted Ozvath's reasoning. It stated that the collection action would not exist without the injury to Harbin and that the claims raised in the collection action were "insufficient on their own to sustain a cause of action." The trial court considered the allegations in both the personal-injury and collection actions and found that Harbin's injury was a "bodily injury" that constituted an "occurrence" under the policy. The court determined that Section I.A.2.a of the General Liability Coverage Part did not apply, because "to hold an individual not a party to [the] jury trial as having intended the injury is a leap of logic and deprivation of due process rights that this Court will not make."

{¶ 59} The trial court further concluded that the stopgap endorsement did not relieve Continental of its obligation to defendant Ozvath in the collection action. The trial court found that Ozvath was not an insured under the stopgap form, because that endorsement applied to employers, and Ohi-Tec–not Ozvath–was Harbin's employer. The court reiterated that there had been no showing that Ozvath intended the injury to

Harbin.

{¶ 60} As stated above, whether Continental had a duty to defend Ozvath in the collection action depends upon whether the allegations in the collection action's complaint state a claim that potentially or arguably falls within the liability-insurance coverage. Ozvath argues that to decide this issue, we must view the allegations in the collection action in light of the personal-injury action, in accordance with *Danis v. Great Am. Ins. Co.*, 159 Ohio App.3d 119, 2004-Ohio-6222.

{¶ 61} In *Danis*, a predecessor of Waste Management of Ohio had purchased certain companies from Danis Industries Corporation, including a subsidiary that managed a landfill known as Valleycrest. Many years after the sale, Waste Management was informed that it was a potentially responsible party under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), and it demanded indemnification from Danis for response costs. The parties settled the claim with Danis's agreement to indemnify Waste Management for "covered claims," which included claims related to pollution. Shortly before executing the settlement, Danis underwent a major corporate restructuring, referred to by the parties as a "recapitalization/split-off." According to later allegations, the split was designed to insulate a profitable subsidiary of Danis from existing and future environmental liabilities to Waste Management.

{¶ 62} When Waste Management later sought indemnification from Danis on a new claim relating to toxic exposure at Valleycrest, Danis informed Waste Management that it lacked the resources to satisfy its obligations for both the CERCLA costs and the new claim. Waste Management filed a federal complaint against Danis and various

officers of the company, alleging wrongful business conduct concerning the earlier settlement and restructuring. Danis and its officers sought coverage and a defense from its insurer, Great American. After Great American denied coverage and refused to advance costs for the lawsuit, Danis and the individuals filed a complaint in state court for breach of contract and declaratory judgment. The trial court found in favor of the Danis plaintiffs (i.e., that Great American did have a duty to defend), finding that the claims by Waste Management were not brought because of any pollution, but because of its Danis's independent and intervening acts of allegedly wrongful business transactions.

{¶ 63} On appeal, we reversed. Initially, we reviewed Danis's policy with Great American (which covered all the Danis plaintiffs). The policy was basically a directors and officers insurance policy, which covered the wrongful-business claims, but excluded claims " 'based upon, arising out of, [or] relating to * * * seepage, pollution, radiation, emission, or contamination of any kind.' " Turning to the allegations in the complaint, we stated:

{¶ 64} "In the present case, only one loss occurred, and that is the damage caused by the polluted site. The acts of the Danis companies and their directors and officers, whether preliminary, concurrent, or subsequent, did not cause a separate injury or loss; instead, the alleged wrongful acts were an attempt to avoid paying for the loss. This is not the typical situation in which one party commits a tort, and the negligent or wrongful act of another party operates to cause either sharing or a complete release of liability for the injury. To the contrary, the same parties (the Danis companies and their affiliates) are allegedly responsible for the entire loss.

{¶ 65} "For a party to be relieved of liability, 'a break in the chain of causation must take place. A break will occur when there intervenes between an agency creating a hazard and an injury resulting therefrom another conscious and responsible agency which could or should have eliminated the hazard. However, the intervening cause must be disconnected from the negligence of the first person and must be of itself an efficient, independent, and self-producing cause of the injury.'

{¶ 66} "To be an intervening cause, ' "the second negligent act must be both 'independent' and 'new.' In the context of this analysis, the second act is 'independent' from the original act if it was not brought into operation by the original act; *i.e.,* the second act must not have occurred as a result of the first. To be considered 'new,' the second act must not have been reasonably foreseeable when the original act occurred." '

{¶ 67} "Applying the above concepts to the present case, we find that the claims involved in the federal [business tort] case are not independent of the original pollution settlements. Instead, the underlying settlements are part of the necessary predicate for liability of the Danis defendants in the federal case. The original pollution settlements and the alleged illegal transfers are intertwined, are directly connected, and are not remote from each other." (Citations omitted.) *Danis,* 159 Ohio App.3d 119, 2004-Ohio-6222, at ¶ 54-57. We thus concluded that the pollution exclusion in the Great American policy applied to the federal business tort action and that the trial court had erred in granting summary judgment to the Danis plaintiffs on Great American's duty to advance costs.

{¶ 68} In the present case (and unlike in *Danis*), the allegations of wrongful

business practices are not covered by the Buckeye policy. Rather, the Buckeye policy provides coverage to Ozvath (and Ohi-Tec) only for "bodily injury" or "property damage." Whereas Great American looked to the prior events to apply an exclusion in *Danis*, Ozvath looks to Harbin's personal-injury action to find a "bodily injury" or a "coverage incident" and thus to apply a duty to defend/coverage under the policy.

{¶ 69} Even if we were to view the personal-injury action and the collection action together, we find no claim that requires Continental to defend Ozvath in the collection action. The General Liability Coverage Part requires Continental to pay any sums that "the insured becomes legally obligated to pay as damages because of 'bodily injury' * * * to which this insurance applies." It further provides that Continental has the duty to defend against any suit seeking such damages. The injury to Harbin's hand constituted a "bodily injury." However, the policy excludes coverage for bodily injury to "an employee of the insured arising out of and in the course of the employment by the insured" as well as bodily injury where the injury is "expected or intended from the standpoint of the insured." With respect to Ohi-Tec, Harbin's employer, the policy did not apply to Harbin's injury because a jury found that the injury resulted from an employer intentional tort, i.e., that Ohi-Tec knew that the injury was substantially certain to occur.

{¶ 70} Ozvath argued, and the trial court agreed, that the jury in the personal-injury action did not make any determination with respect to Ozvath (because Ozvath was not a party to that action), and there were no allegations that Ozvath had personally intended or expected Harbin to be injured. In this respect, the trial court considered only the allegations in the personal-injury action and did not consider the

allegations in the collection action.

{¶ 71} The complaint in the collection action sought to recover on the judgment against Ohi-Tec for its employer intentional tort against Harbin; the complaint in the personal-injury action did not include any claim against Ozvath personally. However, the collection-action complaint alleged that "Charles Ozvath exercised such control and dominion over Ohi-Tec Manufacturing, Inc. that Ohi-Tec Manufacturing, Inc. has not had and/or does not have a separate mind, will, or existence of its own, and/or Defendant is the mere 'alter ego' of Ohi-Tec Manufacturing, Inc." Harbin further alleged that Ozvath had engaged in fraudulent conduct to "protect himself from liability for his own misdeeds, including but not limited to committing intentional tortious conduct to employees." Through these and other allegations, Harbin has alleged that Ozvath stands in the shoes of Ohi-Tec and that Ozvath had the same intent as Ohi-Tec. In essence, Harbin has claimed that Ozvath/Ohi-Tec expected or intended the bodily injury to Harbin and that Ozvath engaged in fraudulent business practices with respect to Ohi-Tec in order to avoid personal liability for the employer intentional tort and to eliminate any probability of collection by Harbin from the corporation.

{¶ 72} Continental represented Ohi-Tec in the personal-injury action due to allegations of negligence by the corporation, and such claims were arguably within Ohi-Tec's coverage. However, there were no allegations in the collection action related to negligence, as the judgment in the personal-injury action was based solely on an employer intentional tort.

{¶ 73} Thus, reading the personal-injury and collection complaints together, Harbin's original complaint in the collection action did not allege " 'bodily injury' * * * to

which this insurance applies." The collection action did not involve negligence and, instead, sought through various business-fraud torts to recover employer-intentional-tort damages, for which Ozvath was allegedly responsible as the alter ego of Ohi-Tec, with the same intent, expectations, and beliefs as the corporation. Such a claim is excluded under the Buckeye policy. And under the terms of the Buckeye policy, Continental had no duty to defend Ozvath against a suit that does not seek damages for " 'bodily injury' * * * to which this insurance applies." Accordingly, the trial court erred in determining that Continental had a duty to defend Ozvath in the collection action. Rather, the trial court should have determined, as a matter of law, that Continental had no duty to defend Ozvath in the collection action.

{¶ 74} We further note that in January 2006, Harbin filed a second amended complaint in the collection action, which changed the nature of that litigation. A similar, third amended complaint was filed in June 2006. The caption of the third amended complaint identified the plaintiff as "Robert Harbin, with derivative standing, for the Estate of Ohi-Tec Manufacturing, Inc." The body of the complaint further indicated that the bankruptcy court had granted Harbin derivative standing to pursue claims against Ozvath and his family "on behalf of the Estate of Ohi-Tec." The various claims alleged that Ozvath's actions had caused loss to the estate of Ohi-Tec and creditors of Ohi-Tec. Consequently, the third amended complaint no longer directly sought payment from Ozvath for the employer-intentional-tort judgment. Rather, it sought, among other things, a "judgment that one [or] more Defendants is liable for the debts of the Estate of Ohi-Tec Manufacturing, Inc. as shall be determined in later proceedings in the matter of *In re Ohi-Tec Manufacturing, Inc.*, currently pending in the United States Bankruptcy

Court for the Southern District of Ohio." Although Harbin's standing was based on his status as a judgment creditor of Ohi-Tec, the direct connection between Harbin's personal-injury judgment and the derivative action was more attenuated, as Harbin sought damages for Ozvath's allegedly fraudulent business conduct on behalf of the Ohi-Tec bankruptcy estate and its other creditors as well as himself.

{¶ 75} Continental's first assignment of error is sustained.

III

{¶ 76} Continental raises the following additional assignments of error:

{¶ 77} "The trial court erred in not determining that appellant CNA was prejudiced by Charles Ozvath's extremely late notice of a claim.

{¶ 78} "The trial court erred in making a supplemental award of attorney fees to appellee Mr. Ozvath.

{¶ 79} "The trial court erred by awarding prejudgment interest."

{¶ 80} Ozvath also raises the following cross-assignments of error:

{¶ 81} "The trial court erred in overruling Chuck Ozvath's motion for summary judgment for indemnification of the collection litigation settlement amount.

{¶ 82} "The trial court erred in determining the amount of attorney fees and prejudgment interest to award to Chuck Ozvath."

{¶ 83} In light of our disposition of Continental's first assignment of error, Continental's additional assignments of error and Ozvath's cross-assignments of error are overruled as moot.

IV

{¶ 84} The trial court's judgment in favor of Ozvath is reversed, and the case is

remanded for the trial court to enter judgment in favor of Continental.

Judgment reversed

and cause remanded.

. . . . . . . . . .

DONOVAN and HALL, JJ., concur.